UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HH MEDICAL, INC., F/K/A APOTHECOM SCOPEMEDICAL INC., <br><br> Plaintiff, <br><br> -against- <br><br> ANNA WALZ and JOHN WALZ, <br><br> Defendants. | Index No. <br><br> **COMPLAINT** |

Plaintiff HH Medical, Inc., f/k/a Apothecom ScopeMedical Inc. ("HH Medical" or "Plaintiff"), by and through its attorneys, Davis+Gilbert LLP, for its Complaint (the "Complaint") against Defendants Anna Walz and John Walz (together, the "Sellers" or "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1. This action arises from HH Medical's $20 million purchase of the medical communications company Medisys Health Communications, LLC, d/b/a MedEvoke ("MedEvoke" or the "Company") (the "Acquisition") and the breaches of representations and warranties that were made to HH Medical about MedEvoke's true financial performance in connection with that Acquisition. In connection with the Acquisition, Sellers made contractual representations to HH Medical regarding the Company's financial performance, including that they had provided income statements for the calendar year 2020 and the 12 months ending March 31, 2021 that were prepared in accordance with generally accepted accounting principles ("GAAP"), and that those income statements fairly presented the Company's financial results. As HH Medical later discovered, however, those representations were false. In fact, the income statements provided as part of the purchase agreement were not prepared in accordance with

GAAP, did not fairly present the Company's financial results, and instead overstated the Company's revenue and EBITDA by including revenue that should not have been recognized under GAAP. Sellers' failure to accurately disclose MedEvoke's financial performance significantly inflated the Company's value, leading HH Medical to purchase MedEvoke for at least $7.8 million more than the Company was really worth.

2. Pursuant to the Membership Interest Purchase Agreement between the Sellers and HH Medical (the "Purchase Agreement"), the Sellers agreed to indemnify HH Medical against any and all losses that might be imposed on or incurred by HH Medical as a consequence of, in connection with, incident to, resulting from, arising out of or in any way related to, or by virtue of, any misrepresentation, inaccuracy or breach of the representations and warranties made by the Sellers in that Purchase Agreement. But despite those contractual obligations and the Sellers' clear breach of the representations and warranties set out in the Purchase Agreement, Sellers have failed and refused to indemnify HH Medical for its resulting losses. As a result, HH Medical seeks by this action to be made whole for the inflated, wrongfully obtained purchase price it paid for MedEvoke and the damages it has suffered as a result of Sellers' breached representations and warranties.

**PARTIES**

3. Plaintiff HH Medical is a Delaware corporation with its principal place of business located in Yardley, Pennsylvania at all times relevant to this action and as of this writing.

4. Upon information and belief, Defendant Anna Walz is an individual who resides in New Jersey and was the Chief Executive Officer and owner of 51% of the membership interests in MedEvoke at the time of the Acquisition.

5. Upon information and belief, Defendant John Walz is an individual who resides in New Jersey and was the owner of the remaining 49% of the membership interests in MedEvoke at the time of the Acquisition.

## JURISDICTION AND VENUE

6. Jurisdiction is proper in this Court, and this Court has personal jurisdiction over Defendants, because HH Medical and the Sellers consented to the exclusive jurisdiction of the federal and state courts located in the County of New York with respect to any proceeding arising out of or relating to the Purchase Agreement, pursuant to Section 10.2 thereof.

7. The Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332 because HH Medical is a citizen of the State of Delaware and Commonwealth of Pennsylvania; the Sellers are citizens of New Jersey; and the amount in controversy exceeds $75,000, exclusive of interests and costs.

8. Venue is proper in this District because HH Medical and the Sellers consented to such venue in the Purchase Agreement.

## ALLEGATIONS COMMON TO ALL CLAIMS

**HH Medical's Purchase of MedEvoke and the Purchase Agreement**

9. MedEvoke is a medical communications company that provides digitally-oriented medical strategy and communications solutions for the biopharmaceutical industry.

10. In 2021, HH Medical negotiated to purchase MedEvoke from Sellers, Anna and John Walz. At the time, Sellers together held 100% of the membership interests in MedEvoke.

11. On June 18, 2021, HH Medical and the Sellers entered into the Purchase Agreement for the sale of MedEvoke to HH Medical.

12. Pursuant to the Purchase Agreement, HH Medical agreed to buy, and the Sellers agreed to sell, all of the membership interests in MedEvoke for an upfront purchase price of $20 million, with a maximum possible earn-out payment of a further $5 million that could bring the total purchase price to $25 million in aggregate. The total final purchase price ultimately paid by HH Medical to Sellers was $20,670,000.

13. The Purchase Agreement provided that all issues related to that agreement would be governed by New York law.

14. Pursuant to the Purchase Agreement, the Sellers made a series of representations and warranties to HH Medical.

15. Among other things, pursuant to Section 3.4, the Sellers represented and warranted that Schedule 3.4 of the Purchase Agreement set forth MedEvoke's (a) balance sheets as of December 31, 2019 and December 31, 2020 and statements of income for such calendar years, and (b) balance sheet as of March 31, 2021 and income statement for the 12 months ending March 31, 2021 (collectively, the "Financial Statements").

16. The Sellers represented and warranted, pursuant to Section 3.4, that "[t]he Financial Statements have been prepared in accordance with GAAP throughout the periods indicated except as set forth on Schedule 3.4(B)."

17. The Sellers further represented and warranted, pursuant to Section 3.4, that the statements of income included in the Financial Statements "fairly present the results of income for the respective periods indicated."

18. In addition, the Sellers represented and warranted, pursuant to Section 3.17, that:

> The amount of all work-in-process, accounts receivable, unbilled invoices (including unbilled invoices for services and out-of-pocket expenses) and other debts due or recorded in the records and books of account of the Company as being due to the Company represent or will represent valid

4

obligations arising from sales actually made or services actually performed in the ordinary course of business.

19. Thus, this Section 3.17 included representations and warranties that amounts shown as due to MedEvoke in its Financial Statements reflected amounts arising from sales or services that had actually taken place.

20. These representations, as well as the others made in Section 3.B of the Purchase Agreement, were made jointly and severally between the Defendants.

21. The transaction closed the same day as the Purchase Agreement was executed, on June 18, 2021.

**Indemnification Obligations under the Purchase Agreement**

22. The Purchase Agreement imposed certain indemnification obligations on the Sellers.

23. Pursuant to Section 8.2.1(a) of the Purchase Agreement, each Seller agreed, jointly and severally, to indemnify and hold harmless HH Medical for Losses arising out of "any misrepresentation, inaccuracy or breach of any representation or warranty contained in Article III.B hereof . . . ."

24. Notwithstanding the foregoing, the parties agreed that Sellers' maximum aggregate liability for any indemnity payment under Section 8.2.1(a) would be no more than 15% of the total final purchase price, *i.e.*, $3,100,500 (being 15% of the $20,670,000 total final purchase price paid).

25. Pursuant to Section 8.7 of the Purchase Agreement, "Losses" are defined as "all liabilities . . . , obligations, losses, damages, demands, claims, actions, suits, judgments, settlements, penalties, interest, out-of-pocket costs, expenses and disbursements (including

reasonable costs of investigation, and reasonable attorneys', accounts' and expert witnesses' fees) of whatever kind and nature . . . ."

**The Financial Statements**

26. As required by the Purchase Agreement, when the parties executed the Purchase Agreement on June 18, 2021, Defendants attached and included the disclosure schedules referenced in the representations and warranties.

27. The Financial Statements called for in Section 3.4 of the Purchase Agreement were provided in Schedule 3.4, which contained, among other things, income statements for MedEvoke for the 12 months ending as of December 31, 2020 and March 31, 2021.

28. The income statements in Schedule 3.4 represented that in 2020, MedEvoke had net sales of approximately $6.7 million and EBITDA of approximately $1.5 million. For the last 12 months ending as of March 31, 2021, the income statement in Schedule 3.4 represented that MedEvoke had net sales of approximately $7 million and EBITDA of approximately $1.3 million.

29. Schedule 3.4(B) to the Purchase Agreement set forth the "Exceptions to GAAP" which, according to Section 3.4, were expressly excluded from Sellers' representation that the Financial Statements were prepared in accordance with GAAP.

30. Schedule 3.4(B) listed three exceptions to GAAP, which involved depreciation of fixed assets, fringe benefits, and bonuses/commissions, none of which are relevant for the purposes of this claim.

**The Sellers Breached their Representations and Warranties
under the Purchase Agreement**

31. Sellers represented and warranted to HH Medical in Section 3.4 of the Purchase Agreement that the Financial Statements set forth in Schedule 3.4 were prepared in accordance

with GAAP unless otherwise specifically stated in Schedule 3.4(B), and fairly presented the financial results of the Company.

33. These representations and warranties were false. As HH Medical later discovered, the revenue reflected in the Financial Statements was significantly inflated as a result of Sellers wrongly recognizing the Company's revenue in violation of GAAP.

33. Sellers' improper revenue recognition, in violation of GAAP, took several forms.

34. First, contrary to GAAP, revenue was recognized and reported with respect to specific projects for which clients never signed a contract, statement of work, or agreement, or never issued a purchase order with respect to that specific project, and for which the Company therefore did not perform any work on that specific project or receive any revenue at all.

35. Second, contrary to GAAP, revenue was improperly recognized with respect to clients that had signed contracts or issued purchase orders for specific projects to be performed by the Company but for which no work had been done as of the respective dates of the applicable Financial Statements. As a result, no revenue should have been recognized as of the dates of those respective Financial Statements.

36. Third, contrary to GAAP, revenue was improperly recognized beyond what was reasonable in light of the amount of work that had been done as of the date of the respective Financial Statements. In other words, Sellers improperly recognized far more revenue in the Financial Statements than was appropriate under GAAP given the amount of work performed in each of the respective periods of the Financial Statements.

37. These instances of improper revenue recognition were not covered by any of the enumerated exceptions to GAAP that Sellers disclosed in Schedule 3.4(B) to the Purchase Agreement.

7

38. By improperly recognizing revenue in this manner, the Financial Statements significantly inflated the revenue and EBITDA figures disclosed to HH Medical.

39. Specifically, although Sellers represented in the Financial Statements that the Company's revenue for 2020 was $6.7 million, the Company's actual revenue for 2020 when recognized in accordance with GAAP was approximately $6 million—*$714,000 less than Sellers had represented*.

40. Likewise, for the period January 1, 2021 through March 31, 2021, revenue was overstated by approximately $72,000. For the calendar year 2021, net revenue during this period was overstated by approximately $1.2 million, even when revenue that was improperly recognized in 2020 was appropriately shifted back into 2021 where it belonged under GAAP.

41. Because the revenue reported in the Financial Statements was inflated, the EBITDA contained in the Financial Statements was inflated as well. EBITDA is a standard and important metric that measures a company's profits, is often used to value target companies during an acquisition process, and was the valuation metric used in this Acquisition. During an acquisition process, once the EBITDA has been identified, a commercial multiplier is then applied to the EBITDA in order to land at the target company's enterprise value. Sellers represented in the Financial Statements that 2020 EBITDA was $1,486,000. But after deducting the $714,000 of revenue that should not have been recognized in 2020, the Company's EBITDA for that year was actually $772,000—*roughly half the amount Sellers represented* to HH Medical in the Purchase Agreement.

42. As a result, the Financial Statements disclosed to HH Medical in the Schedules (i) were not prepared in accordance with GAAP, and (ii) did not fairly present the financial results of the Company.

43. Thus, the representations and warranties contained in Section 3.4 of the Purchase Agreement were clearly breached.

44. As noted, the income statements contained in the Financial Statements were overstated as a result of Sellers recognizing revenue from specific projects for which the Company did not perform any work or did not perform the amount of work that would have justified the amount of revenue recognized. Upon information and belief, by overstating revenue on the Financial Statements' income statements, Sellers likely also misstated the corresponding amounts reflected in the Financial Statements' balance sheets, and thus breached their representations in Sections 3.4 and 3.17, respectively, that (i) the balance sheets "fairly present[] the financial condition of the Company at the respective date thereof," and (ii) amounts recorded as due, accrued and owing to the Company "represent or will represent valid obligations arising from sales actually made or services actually performed in the ordinary course of business."

45. Pursuant to Section 8.2.1 of the Purchase Agreement, HH Medical is entitled to indemnification from Sellers for Losses suffered as a result of these breaches that exceed a $200,000 "Basket," up to a "Cap" of 15% of the total final Purchase Price, i.e., $3,100,500. HH Medical's Losses—contractually defined to include attorneys' and expert fees and costs—are well in excess of the Basket and Cap.

46. On December 15, 2022, HH Medical sent notice to Sellers of its claims for indemnification for breaches of the representations and warranties under the Purchase Agreement.

47. On January 12, 2023, Sellers sent a notice to HH Medical in which Sellers wrongfully rejected HH Medical's claims. To date, Sellers have not indemnified HH Medical for any of its Losses arising from Sellers' breaches of the Purchase Agreement.

**HH Medical Suffered Losses as a Result of Sellers' Breaches**

48. As a result of the Sellers' breaches of representations and warranties, HH Medical was left with a company that was worth significantly less than the Sellers had made it appear to be worth and significantly less than the $20 million upfront purchase price that HH Medical paid.

49. The purpose of the contractual provisions of Article 3 of the Purchase Agreement—*e.g.*, requiring Sellers to provide the Financial Statements for 2020 and the beginning of 2021 (and the revenue and EBITDA amounts set out therein), and to represent that the Financial Statements were prepared in accordance with GAAP and fairly presented the Company's financial results—was to give HH Medical a basis for (and was, in fact, used by HH Medical for) determining MedEvoke's enterprise value and the associated purchase price that HH Medical was willing to pay for the Company.

50. By failing to provide accurate Financial Statements in accordance with Article 3 of the Purchase Agreement, Sellers inflated the Company's true enterprise value and fair purchase price.

51. Had Sellers complied with their contractual obligations and provided HH Medical with the Company's actual Financial Statements prepared in accordance with GAAP, this would have reflected an enterprise value of MedEvoke significantly below the $20 million purchase price actually paid.

52. HH Medical is entitled to damages in an amount equal to the difference between the inflated upfront $20 million purchase price and the actual value of the Company at the time of the Acquisition based on the true, properly accounted revenue and EBITDA figures withheld by Sellers at the time of the Acquisition.

53. Consistent with common practice in this type of M&A transaction, the parties used a multiple of EBITDA, based on Sellers' financial disclosures, to evaluate and negotiate an appropriate enterprise value and purchase price for the Company.

54. Applying the same enterprise valuation method to the actual, properly accounted financial performance of the Company at the time of the Acquisition would have yielded an enterprise value of approximately $12.2 million—*$7.8 million less* than the initial inflated $20 million purchase price HH Medical paid.

55. Indeed, had Sellers disclosed the Company's actual, properly accounted revenue and EBITDA for 2020, HH Medical's enterprise value for the Company would have been substantially lower, as revenue, EBITDA, and associated multiples used to calculate a purchase price would have decreased. In addition, lower reported 2020 revenue and EBITDA necessarily would have implied lower projected 2021 revenue and EBITDA, impacting the expected growth and related enterprise value of the Company.

56. Disclosed revenue and EBITDA for 2021 were likewise inflated by Sellers' improper revenue recognition. As a result, the growth that Sellers were representing that the Company was experiencing was false.

57. In summary, and across 2020 and 2021, the Company simply was not as profitable or successful as the Sellers had represented in the Purchase Agreement. The undisclosed information would have revealed to HH Medical troubling information about how the Company was actually performing and would have undermined the picture of growth that had been previously presented.

58. Sellers' misrepresentations have had an ongoing detrimental impact on the Company's bottom line. In 2021, Company employees were left completing projects that Sellers

had represented were already delivered in 2020 (and for which revenue had already been improperly recognized). That, in turn, pushed 2021 projects into 2022, notwithstanding Sellers' representation that many of those projects had already been delivered as well. As a result, Company staff was tied up on old projects when they could have been—and should have been—working on new projects to generate new revenue. This has had, and continues to have, a compounding effect on the business as time goes on.

59. HH Medical's estimated Loss attributable to Sellers' breaches of their representations and warranties is at least $7.8 million, plus attorneys' and expert fees and costs which are contractually included in HH Medical's compensable Losses. These Losses far exceed the $3,100,500 liability Cap as set forth in Section 8.2.1 of the Purchase Agreement.

**FIRST CAUSE OF ACTION**
**(Contractual Indemnification for Breach of Representations and Warranties)**

60. Plaintiff repeats and realleges the allegations stated in paragraphs 1 through 59 of the Complaint as if set forth fully herein.

61. The Purchase Agreement is a valid and binding contract between HH Medical and the Sellers.

62. HH Medical has performed all of its material duties and responsibilities pursuant to the Purchase Agreement, including paying the purchase price.

63. Pursuant to the Purchase Agreement Section 8.2.1(a), the Sellers have a duty to jointly and severally indemnify HH Medical for Losses suffered by HH Medical as a result of the Sellers' breaches of representations and warranties in the Purchase Agreement.

64. The Sellers were obligated to make the representations and warranties contained in Sections 3.4 of the Purchase Agreement.

65. Sellers breached their representations and warranties in Section 3.4 of the Purchase Agreement by providing Financial Statements for 2020 and part of 2021 that were not prepared in accordance with GAAP revenue recognition rules and did not fairly present MedEvoke's financial results as of the dates stated.

66. Sellers have breached their indemnification obligation by refusing to fulfill their obligation by letter dated January 12, 2023. HH Medical duly served notice of its claim for indemnification under the Purchase Agreement, but Sellers wrongfully disputed the claim. For the reasons discussed herein, Sellers' rejection and dispute of HH Medical's claim for indemnification is meritless.

67. HH Medical is entitled to indemnification for the breach of representations and warranties in the amount of its Losses, to be determined at trial but not less than $3,100,500, plus attorneys' and expert fees and costs which are contractually included in HH Medical's recoverable Losses, plus prejudgment interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for relief as follows:

(a) That judgment be entered in favor of Plaintiff against the Sellers in an amount to be determined at trial, but not less than $3,100,500, in accordance with the terms of the Purchase Agreement, plus attorneys' and expert fees and costs, which are contractually included in HH Medical's recoverable Losses;

(b) That Plaintiff be awarded pre-judgment and post-judgment interest;

(c) That Plaintiff be awarded its costs, expenses, and attorneys' fees in this action; and

(d) That the Court award Plaintiff such other and further relief as may be just and proper.

Dated:  October 6, 2023  **DAVIS+GILBERT LLP**

By: /s/ Howard J. Rubin
Howard J. Rubin
Jacklyn M. Siegel
1675 Broadway
New York, New York 10019
Telephone:  (212) 468-4800
Facsimile:  (212) 468-4888
hrubin@dglaw.com
jsiegel@dglaw.com

*Attorneys for Plaintiff
HH Medical, Inc., f/k/a Apothecom
ScopeMedical Inc.*