UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HH MEDICAL, INC., *f/k/a* APOTHECOM SCOPEMEDICAL INC.,

                Plaintiff,

– against –

ANNA WALZ and JOHN WALZ,

                Defendants.

**OPINION & ORDER**

23-cv-08809 (ER)

---

RAMOS, D.J.:

        This action arises from allegations that Anna and John Walz refused to indemnify HH Medical, Inc., after breaching representations and warranties made in the sale of their company to HH Medical. Before the Court is the Walzes' motion to dismiss the complaint. Doc. 13. For the reasons set forth below, the motion is DENIED.

## I.    BACKGROUND

### A. The Parties

HH Medical is a Delaware corporation with its principal place of business located in Yardley, Pennsylvania. Doc. 1 ¶ 3 ("Compl."). The Walzes are residents of New Jersey. *Id.* ¶¶ 4–5.

### B. HH Medical's Purchase of MedEvoke

MedEvoke is a medical communications company. *Id.* ¶ 9. In 2021, HH Medical negotiated to purchase MedEvoke from the Walzes, who collectively held 100% of the membership interests in MedEvoke. *Id.* ¶ 10. On June 18, 2021, HH Medical and the Walzes entered into a written purchase agreement for the sale of MedEvoke to HH Medical (the "Purchase Agreement").[1] *Id.* ¶ 11. Under the Purchase Agreement, HH

---

[1] The Court may consider the Purchase Agreement, Doc. 16-1, because it is incorporated by reference in the complaint. *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). Although HH Medical alleges that it entered into the Purchase Agreement with the Walzes, the Purchase Agreement names

Medical agreed to buy the Walzes' membership interests in MedEvoke for an upfront price of $20 million plus possible additional payments that could raise the total price to $25 million.  *Id.* ¶ 12.  HH Medical ultimately paid the Walzes $20,670,000.  *Id.*  The transaction closed the same day as the Purchase Agreement was executed.  *Id.* ¶ 21.

### C. The Purchase Agreement

#### 1. *Representations and Warranties*

Pursuant to the Purchase Agreement, the Walzes made a series of representations and warranties to HH Medical (the "Warranties").  *Id.* ¶ 14.  The Walzes represented and warranted that Schedule 3.4 of the Purchase Agreement set forth certain MedEvoke financial statements (the "Financial Statements").[2]  *Id.* ¶ 15.  Under Section 3.4 of the Purchase Agreement, the Walzes represented and warranted that "[t]he Financial Statements have been prepared in accordance with GAAP [generally accepted accounting principles] throughout the periods indicated except as set forth on Schedule 3.4(B)" and that the statements of income included in the Financial Statements "fairly present the results of income for the respective periods indicated."  *Id.* ¶¶ 16–17 (first alteration in original); Doc. 16-1 at 10.  Under Section 3.17, the Walzes represented and warranted that:

> The amount of all work-in-process, accounts receivable, unbilled invoices (including unbilled invoices for services and out-of-pocket expenses) and other debts due or recorded in the records and books of account of [MedEvoke] as being due to [MedEvoke] represent or will represent valid obligations arising from sales actually made or services actually performed in the ordinary course of business.

---

"Apothecom ScopeMedical Inc." as the purchaser, not HH Medical.  Doc. 16-1 at 1 (capitalization omitted).  HH Medical identifies itself as "HH Medical, Inc., f/k/a Apothecom ScopeMedical Inc." in the caption of the complaint.  Compl. at 1 (capitalization omitted).  As discussed in more detail below, HH Medical asserts that the caption makes clear that "HH Medical and Apothecom are one and the same."  Doc. 15 at 23.  Throughout this opinion, the Court refers to the purchaser in the Purchase Agreement as HH Medical.

[2] The Financial Statements include MedEvoke's balance sheets as of December 31, 2019, and December 31, 2020; statements of income for those calendar years; balance sheet as of March 31, 2021; and an income statement for the twelve months ending March 31, 2021.  Compl. ¶ 15.

Compl. ¶ 18; Doc. 16-1 at 22.  The purpose of the Financial Statements and the Warranties was to give HH Medical a basis for calculating MedEvoke's value and the purchase price HH Medical would be willing to pay.  Compl. ¶ 49.

### 2. Indemnification Provision

In Section 8.2.1(a) of the Purchase Agreement, the Walzes agreed to indemnify HH Medical for "Losses" arising out of "any misrepresentation, inaccuracy or breach of any representation or warranty contained in Article III.B hereof."  *Id.* ¶ 23; Doc. 16-1 at 38.  The Purchase Agreement defines "Losses" as "all liabilities . . . , obligations, losses, damages, demands, claims, actions, suits, judgments, settlements, penalties, interest, out-of-pocket costs, expenses and disbursements (including reasonable costs of investigation, and reasonable attorneys', account[ants]' and expert witnesses' fees) of whatever kind and nature."  Compl. ¶ 25 (omission in original); Doc. 16-1 at 47.

The parties also agreed that the maximum aggregate indemnity payment under Section 8.2.1(a) would be 15% of the total purchase price.  Compl. ¶ 24.  Because the final purchase price was $20,670,000, the maximum indemnity payment is $3,100,500.  *Id.*

### 3. Financial Statements

The Financial Statements represented that in 2020, MedEvoke had net sales of approximately $6.7 million and EBITDA of approximately $1.5 million.[3]  *Id.* ¶ 28.  For the twelve months ending March 31, 2021, the Financial Statements represented that MedEvoke had net sales of approximately $7 million and EBITDA of approximately $1.3 million.  *Id.*  In order to negotiate an appropriate purchase price for MedEvoke, HH Medical estimated the company's value by applying a commercial multiplier to its EBITDA.  *Id.* ¶¶ 41, 53.

---

[3] EBITDA—which stands for "earnings before interest, taxes, depreciation, and amortization"—is a metric that measures a company's profits.  Compl. ¶ 41.  It is often used to value target companies during the acquisition process, and it was the valuation metric used in this acquisition.  *Id.*

### D. The Walzes' Alleged Breaches

HH Medical later discovered that MedEvoke's revenue reflected in the Financial Statements was significantly inflated because the Walzes had wrongly recognized revenue in violation of GAAP. *Id.* ¶ 32. First, revenue was improperly recognized with respect to projects for which clients never signed a contract or issued a purchase order, and for which the company therefore did not perform any work or receive any revenue. *Id.* ¶ 34. Second, revenue was improperly recognized with respect to projects for which clients had signed a contract or issued a purchase order, but for which no work had been done as of the respective dates of the applicable Financial Statements. *Id.* ¶ 35. Third, the Walzes recognized more revenue in the Financial Statements than was appropriate under GAAP given the amount of work performed in each of the respective periods of the Financial Statements. *Id.* ¶ 36.

By improperly recognizing revenue in this manner, the Financial Statements inflated MedEvoke's revenue for 2020 by $714,000 and inflated its revenue between January 1 and March 31, 2021, by $72,000. *Id.* ¶¶ 38–40. For the calendar year 2021, net revenue was inflated by approximately $1.2 million. *Id.* ¶ 40. By overstating revenue in this way, the Financial Statements also inflated MedEvoke's EBITDA. *Id.* ¶¶ 38, 41.

As a result of the Walzes' breaches of their representations and warranties, HH Medical alleges, it was left owning a company worth significantly less than the price that HH Medical paid for it. *Id.* ¶ 48. HH Medical's estimated loss attributable to the Walzes' breaches is at least $7.8 million. *Id.* ¶ 59.

### E. The Walzes' Refusal to Indemnify HH Medical

On December 15, 2022, HH Medical notified the Walzes of its claims for indemnification for breaches under the Purchase Agreement. *Id.* ¶ 46. On January 12, 2023, the Walzes sent a notice to HH Medical rejecting HH Medical's claims. *Id.* ¶ 47. To date, they have refused to indemnify HH Medical for any of its losses. *Id.*

### F. Procedural History

HH Medical commenced this action on October 6, 2023. HH Medical's sole claim is for contractual indemnification for breach of representations and warranties. *Id.* ¶¶ 60–67. HH Medical seeks damages of at least $3,100,500, pre- and post-judgment interest, costs, expenses, and attorney fees. *Id.* at 13. The Walzes have moved to dismiss the complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Doc. 13.

## II. LEGAL STANDARD

In considering a motion to dismiss pursuant to Rule 12(b)(6), a court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The purpose of Rule 12(b)(6) "is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (citation omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). To state a plausible claim, the plaintiff must "'raise a reasonable expectation that discovery will reveal evidence' of the wrongdoing alleged, 'even if it strikes a savvy judge that actual proof of those facts is improbable.'" *Citizens United v. Schneiderman*, 882 F.3d 374, 380 (2d Cir. 2018) (quoting *Twombly*, 550 U.S. at 556). If the plaintiff has

not "nudged [the] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

## III. DISCUSSION

HH Medical brings a single claim for contractual indemnification for breach of representations and warranties. Compl. ¶¶ 60–67. "Under New York common law, upon showing that: (1) plaintiff and defendant entered into a contract; (2) containing an express warranty by the defendant with respect to a material fact; (3) which warranty was part of the basis of the bargain; and (4) the express warranty was breached by defendant, plaintiff is entitled to be indemnified for any damages incurred as a result of such breach." *Promuto v. Waste Mgmt., Inc.*, 44 F. Supp. 2d 628, 642 (S.D.N.Y. 1999).

According to the Walzes, the complaint fails to allege that HH Medical relied on any representations that the Walzes made. Doc. 13-1 at 5. They also maintain that the complaint fails to request any recoverable damages as a result of the alleged breach. *Id.* at 10. And they assert that HH Medical has not established that it is the proper plaintiff. *Id.* at 15. The Court addresses these arguments in turn.

### A. Reliance

The Walzes contend that HH Medical has not satisfied the reliance requirement because the complaint fails to allege that "the warranties issued by [the Walzes] were the 'basis of the bargain.'" Doc. 13-1 at 9. HH Medical argues that it has sufficiently alleged that "the breached warranties were bargained-for terms of the Purchase Agreement." Doc. 15 at 10.

The Court finds *CBS Inc. v. Ziff-Davis Publ'g Co.*, 553 N.E.2d 997 (N.Y. 1990), to be controlling on this issue. In that case, plaintiff CBS entered a purchase agreement to buy several magazine businesses from defendant Ziff-Davis. *Id.* at 998. The purchase agreement contained warranties from Ziff-Davis that the financial statements for the businesses were accurate and had been prepared in accordance with GAAP. *Id.* at 998–99. Before the deal closed, however, CBS conducted its own due diligence and began to

6

suspect that the financial statements were inaccurate. *Id.* at 999. CBS informed Ziff-Davis of its suspicions. *Id.* Ziff-Davis responded that CBS's position was meritless and demanded that CBS proceed with the closing. *Id.* CBS agreed to close, but it expressly stated that there was a dispute between the parties and that it was not waiving any rights by closing. *Id.* After closing, CBS sued for breach of warranty. *Id.* The trial court dismissed the claim "because CBS alleged 'it did not believe that the representations set forth in [two paragraphs] of the contract of sale were true' and thus CBS did not satisfy 'the law in New York [which] clearly requires that this reliance be alleged in a breach of warranty action.'" *Id.* (second alteration in original). The Appellate Division affirmed. *Id.*

On appeal, the New York high court reversed the dismissal of the breach of warranty claim. *Id.* The court agreed with CBS's formulation of the reliance requirement in actions for breach of express warranties. *Id.* at 1000. Specifically, the court explained: "The critical question is not whether the buyer believed in the truth of the warranted information, as Ziff-Davis would have it, but whether [it] believed [it] was purchasing the [seller's] promise [as to its truth]." *Id.* at 1000–01 (alterations in original) (internal quotation marks and citation omitted). "This view of 'reliance'" requires "no more than reliance on the express warranty as being a part of the bargain between the parties." *Id.* at 1001. Applying that principle, the court observed:

> Unquestionably, the financial information pertaining to the income and expenses of the consumer magazines was relied on by CBS in forming its opinion as to the value of the businesses and in arriving at the amount of its bid; the warranties pertaining to the validity of this financial information were express terms of the bargain and part of what CBS contracted to purchase. CBS was not merely buying identified consumer magazine businesses. It was buying businesses which it believed to be of a certain value based on information furnished by the seller which the seller warranted to be true.

*Id.* at 1002. Thus, the court concluded that Ziff-Davis should not be relieved of its warranty obligations. *Id.*

7

Here, HH Medical alleges that the Walzes warranted that the Financial Statements were prepared in accordance with GAAP and that they fairly presented MedEvoke's financial results. Compl. ¶ 31. And the purpose of the Warranties "was to give HH Medical a basis for (and was, in fact, used by HH Medical for) determining MedEvoke's enterprise value and the associated purchase price that HH Medical was willing to pay for the Company." *Id.* ¶ 49; *see also id.* ¶ 53 (alleging that "the parties used a multiple of EBITDA, based on [the Walzes'] financial disclosures, to evaluate and negotiate an appropriate enterprise value and purchase price for the Company"). Thus, just as in *CBS*, HH Medical has alleged that it believed it was purchasing the Walzes' promise as to the truth of the Warranties. HH Medical asserts that it relied on the information in the Financial Statements to determine MedEvoke's value and that the Warranties were express terms of the Purchase Agreement. Therefore, HH Medical has sufficiently alleged that the Warranties were part of the basis of the bargain.

The Walzes also argue that the complaint is insufficient because it is silent on the issue of "knowledge." Doc. 13-1 at 9. According to the Walzes, "a plaintiff is required to demonstrate the element of 'knowledge' since 'what the buyer knew and, most importantly, whether he got that knowledge from the seller are the critical questions.'" Doc. 18 at 2 (quoting *Kriegel v. Donelli*, No. 11-cv-9160 (ER), 2014 WL 2936000, at *7 (S.D.N.Y. June 30, 2014)).

This argument fails as well. The Walzes cite *Kriegel*, but that case involved a warranty that the seller of a dental practice did not know of any material fact adversely affecting the practice's business prospects of which the buyer had not been made aware. 2014 WL 2936000, at *1, *4. After the sale, a valued employee left the practice, and the buyer brought a breach of warranty claim. *Id.* On summary judgment, the seller argued that the buyer had agreed to the sale knowing that the employee might leave, so the employee's intention to leave could not have affected the buyer's decision to purchase the practice. *Id.* at *8. But the court found that there was no evidence in the record to

8

suggest that the seller had expressed any doubts to the buyer about the employee's intention to remain at the practice. *Id.* at *10. As a result, the court explained, "this is not a case in which the seller's disclosure of the inaccuracy of certain warranted information forecloses the buyer from claiming that he believed that he was purchasing the seller's promise of truth of the warranted information." *Id.* In this case, likewise, there is nothing in the record to suggest that the Walzes disclosed the inaccuracy of the Warranties to HH Medical.

The Walzes also point to *Galli v. Metz*, 973 F.2d 145 (2d Cir. 1992), but that case does not help them for similar reasons. There, the buyers purchased three companies from the sellers and obtained extensive warranties. *Id.* at 147. After the deal closed, several unexpected liabilities arose, and the buyers refused to pay the full purchase price. *Id.* When the sellers sued for breach of contract, the buyers answered with a counterclaim asserting breach of warranty and other claims. *Id.* The sellers had warranted that they were not aware of any facts that might result in claims that could adversely affect the companies—even though they knew about hazardous waste contamination on property formerly used by one of the companies. *Id.* at 150. Following a bench trial, the court ruled in favor of the sellers because the contamination was disclosed to the buyers prior to closing. *Id.* On appeal, the Second Circuit explained that "[w]here a buyer closes on a contract in the full knowledge and acceptance of facts disclosed by the seller which would constitute a breach of warranty under the terms of the contract, the buyer should be foreclosed from later asserting the breach." *Id.* at 151. Since the district court did not determine who had disclosed the contamination to the buyers, the Second Circuit remanded that question for further development. *Id.* Again, however, there is no indication in this case that HH Medical learned from the Walzes before closing that the Warranties were inaccurate.

At this stage, HH Medical has satisfied the "reliance" requirement by alleging that the Warranties were part of the basis of the parties' bargain.

9

### B. Damages

Next, the Walzes argue that HH Medical seeks damages that are not recoverable under the Purchase Agreement. Doc. 13-1 at 10. As a preliminary matter, the Walzes contend that "[i]n reviewing the Agreement's language for purposes of the Defendants' indemnification of Plaintiff, the Court must narrowly construe the language contained therein." *Id.* at 11. They cite *Hooper Associates, Ltd. v. AGS Computers, Inc.*, 548 N.E.2d 903 (N.Y. 1989), for the proposition that "[w]hen a party is under no legal duty to indemnify, a contract assuming that obligation must be strictly construed to avoid reading into it a duty which the parties did not intend to be assumed." *Id.* at 905. In this case, however, the Purchase Agreement *did* impose a legal duty to indemnify: under Section 8.2.1(a), the Walzes agreed to indemnify HH Medical for any "Losses" arising out of any misrepresentation or breach of warranty. Doc. 16-1 at 38; *see Major Energy Elec. Servs., LLC v. Horowitz*, No. 19-cv-10431 (NRB), 2020 WL 4432121, at *6 n.1 (S.D.N.Y. July 31, 2020) (rejecting the sellers' reliance on *Hooper* where the relevant agreement "imposed a clear legal duty" on the sellers to indemnify the plaintiffs for the breach of any representation or warranty).

The Walzes further argue that HH Medical fails to allege any "Losses" as defined in the Purchase Agreement. Doc. 13-1 at 10. They assert that the definition of "Losses" does not include "lost profits," "diminution of value," or "consequential damages," so HH Medical cannot recover for any such losses. *Id.* at 12. HH Medical responds that the alleged damages are the difference between MedEvoke's value as warranted by the Walzes and its actual value at the time of closing. Doc. 15 at 15. Those damages, according to HH Medical, are "the standard form of compensation for a breach of warranty claim" and "fall squarely within the scope of indemnifiable losses under the Purchase Agreement." *Id.*

The Court finds *Powers v. Stanley Black & Decker, Inc.*, 137 F. Supp. 3d 358 (S.D.N.Y. 2015), instructive on this issue. In that case, the court considered whether an

10

indemnification provision allowed for the recovery of diminution in value damages based on the sellers' breach of warranties. *Id.* at 384–85. As relevant here, the indemnification provision in *Powers* required the sellers to indemnify the buyer "for all Losses imposed on or incurred by [the buyer] . . . based upon, arising out of, in connection with, or resulting from, directly or indirectly, (i) the inaccuracy or untruth of any of the representations or warranties made by the [sellers]." *Id.* at 385. The definition of "Losses" was similar to the one at issue in this case, as it covered:

> [A]ll demands, claims, actions or causes of action, assessments, losses, damages, costs, expenses, liabilities, judgments, awards, fines, sanctions, penalties, charges and amounts paid by a Person in settlement, including reasonable costs, fees and expenses of attorneys, experts, accountants, appraisers, consultants, witnesses, investigators, and any other agents or representatives of such Person, but specifically excluding . . . lost profits [or] consequential damages . . . .

*Id.* (first alteration in original). The sellers argued that diminution of value damages qualified as "lost profits" or "consequential damages" and thus were unrecoverable. *Id.*

The court disagreed, holding that "diminution of value instead is classified as a form of 'general damages.'" *Id.* As the court explained, "[g]eneral damages compensate the injured party for the value of the very performance promised" and "include those damages that are the natural and probable consequence of the breach." *Id.* at 385–86 (internal quotation marks and citations omitted). "Therefore, where the seller makes misrepresentations about the business he is selling, the natural and probable result is that the business is actually worth less than the buyer paid, and diminution of value damages therefore compensate the buyer for the 'value of the promised performance.'" *Id.* at 386 (quoting *Schonfeld v. Hilliard*, 218 F.3d 164, 176 (2d Cir. 2000)). The court concluded that the diminution of value damages sought by the buyer were available under the agreement "as damages that 'directly or indirectly' resulted from the [sellers'] inaccurate warranties and representations." *Id.* at 385.

11

While HH Medical uses the term "benefit of the bargain" damages, Doc. 15 at 16, it essentially seeks the same kind of diminution in value damages as the buyer in *Powers*: "damages in an amount equal to the difference between the inflated upfront $20 million purchase price and the actual value of the Company at the time of the Acquisition." Compl. ¶ 52. The indemnification provision in the parties' Purchase Agreement covers "Losses" arising out of any misrepresentation or breach of warranty. Doc. 16-1 at 38. The definition of "Losses," in turn, includes:

> all liabilities . . . , obligations, losses, damages, demands, claims, actions, suits, judgments, settlements, penalties, interest, out-of-pocket costs, expenses and disbursements (including reasonable costs of investigation, and reasonable attorneys', accountants' and expert witnesses' fees) of whatever kind and nature; provided that Losses shall not include Consequential Damages except to the extent asserted in a Third Party Claim.

*Id.* at 47–48. As in *Powers*, the alleged losses are not consequential damages; they are diminution in value damages that arise from the Walzes' alleged misrepresentations and therefore are within the scope of the indemnification provision. *See Powers*, 137 F. Supp. 3d at 385.

The Walzes also assert that HH Medical has not alleged that its loss "is one which is perpetual in nature." Doc. 13-1 at 13. Specifically, the Walzes take issue with HH Medical's reliance on an EBITDA multiplier. *Id.* To calculate damages using a multiple of EBITDA, the Walzes contend, HH Medical "must allege that there was a diminution of the company's earnings in perpetuity." *Id.* at 14 (citing *Zayo Grp., LLC v. Latisys Holdings, LLC*, No. 12874 (VCS), 2018 WL 6177174, at *16 (Del. Ch. Nov. 26, 2018)). Because the complaint does not allege any permanent losses, the Walzes argue that it must be dismissed. *Id.*

The Court declines to adopt the Walzes' proposed pleading requirement. The Walzes rely on language from *Zayo* stating that the "benefit of the bargain" method of calculating damages is appropriate "only when the alleged breach of the representation or

warranty has caused a permanent diminution in the value of the business (as a result of lost revenues into perpetuity) and the business has thereby been permanently impaired." *Zayo*, 2018 WL 6177174, at \*16. As another decision from the Delaware Court of Chancery recognized, however, *Zayo* was "a post-trial opinion in which the Court had the benefit of a full record and expert testimony on the subject." *Swipe Acquisition Corp. v. Krauss*, No. 2019-0509 (PAF), 2020 WL 5015863, at \*7 (Del. Ch. Aug. 25, 2020). The *Swipe* court also explained:

> At the pleadings stage, it is reasonably conceivable that an EBITDA multiple could support a damages calculation. Plaintiff alleges that the parties discussed using an EBITDA multiple to calculate the purchase price and that the Buyers, in fact, did so. Foreclosing calculating damages using an EBITDA multiple at this stage, as Defendants urge, would require the Court to make that determination without the benefit of a record and, worse yet, to ignore Plaintiff's allegations and, instead, draw inferences in favor of Defendants.

*Id.* (footnote omitted).

Here too, based on the complaint's allegations, it is plausible that a multiple of EBITDA could support a damages calculation. HH Medical seeks damages "in an amount equal to the difference between the inflated upfront $20 million purchase price and the actual value of the Company at the time of the Acquisition based on the true, properly accounted revenue and EBITDA figures." Compl. ¶ 52. The complaint alleges that the parties "used a multiple of EBITDA . . . to evaluate and negotiate an appropriate enterprise value and purchase price for the Company." *Id.* ¶ 53; *see Swipe*, 2020 WL 5015863, at \*7 (noting that plaintiff alleged that buyers used an EBITDA multiple to calculate the purchase price); *cf. Zayo*, 2018 WL 6177174, at \*17 ("[T]here is no evidence that Zayo actually based its purchase price on a multiple of EBITDA."). And to estimate the actual value of MedEvoke at the time of the acquisition, HH Medical relied on the same valuation method used to determine the original purchase price, but it applied that method to "the actual, properly accounted financial performance of the

13

Company at the time of the Acquisition." Compl. ¶ 54.  At this stage, those allegations are sufficient.

### C.  Proper Party

Finally, the Walzes argue that HH Medical has failed to establish that it is a party to the agreement at issue.  Doc. 13-1 at 15.  As noted above, the Purchase Agreement names "Apothecom ScopeMedical Inc." as the purchaser, not HH Medical.  Doc. 16-1 at 1 (capitalization omitted).  According to the Walzes, HH Medical has failed to adequately allege that it has an interest in that agreement.  Doc. 13-1 at 15–16.

HH Medical responds that the complaint makes clear that "HH Medical and Apothecom are one and the same."  Doc. 15 at 23.  While Apothecom signed the Purchase Agreement, it later changed its name to HH Medical, so Apothecom "continues to exist in its same legal form, with all the same rights, but under a new name."  *Id.*

The complaint's sole reference to Apothecom is in the caption, which lists the plaintiff in this action as "HH Medical, Inc., f/k/a Apothecom ScopeMedical Inc."  Compl. at 1 (capitalization omitted).  The parties do not dispute that "f/k/a" is shorthand for "formerly known as."  Doc. 13-1 at 15; Doc. 15 at 23.  But they disagree on whether that notation is sufficient.

The Court can reasonably infer from the caption that HH Medical is the same legal entity as Apothecom and thus is the proper plaintiff to bring this action.  In other contexts, courts have relied on a "formerly known as" designation in the caption of the complaint.  *See Taylor-Norman v. JoCo Assembly*, No. 09-cv-410 (TCK) (FHM), 2010 WL 3521610, at *7 (N.D. Okla. Sept. 7, 2010) (allegation in caption that defendant JoCo was "formerly known as" PBM was sufficient to allege that JoCo was liable for PBM's actions under doctrine of successor liability); *W. Refin. Yorktown, Inc. v. BP Corp. N. Am. Inc.*, 618 F. Supp. 2d 513, 528 (E.D. Va. 2009) (concluding that it was "not unreasonable to infer in Plaintiff's favor that 'f/k/a,' when used in the caption identifying the plaintiff . . . , merely denotes a change in corporate name").

The Walzes' cited cases do not suggest otherwise. Doc. 13-1 at 16. In *Tim-Minn, Inc. v. Tim Hortons USA Inc.*, No. 20-cv-23481 (KMW) (EGT), 2021 WL 4482733 (S.D. Fla. Aug. 2, 2021), *report and recommendation adopted*, 2021 WL 4480281 (S.D. Fla. Sept. 30, 2021), the question was whether plaintiff Tim-Minn and individual franchisee plaintiffs were in privity. *Id.* at *5–6. The defendant argued that they were because the franchisee plaintiffs were subsidiaries, but the court rejected that argument due to a lack of allegations about the subsidiaries' corporate structure and whether they operated independently. *Id.* at *7. The Walzes also cite *Cortlandt Street Recovery Corp. v. Hellas Telecommunications, S.à.r.l.*, 790 F.3d 411 (2d Cir. 2015), for the general principle that "a non-party to the contract lacks standing to sue for breach absent a valid assignment of the claim." Doc. 13-1 at 16. In neither of these cases, however, did the court address the question at issue here: whether, at the pleading stage, the use of "formerly known as" in the caption is sufficient to allow a corporation to stand in the shoes of its predecessor and bring a contractual claim.

## IV.   CONCLUSION

For the foregoing reasons, the Walzes' motion to dismiss, Doc. 13, is DENIED. HH Medical's request for oral argument, Doc. 17, is DENIED as moot. The parties are directed to appear for an initial pretrial conference on June 14, 2024, at 10:30 a.m. The parties should dial 877-411-9748 and enter access code 3029857# when prompted.

The Clerk of Court is respectfully directed to terminate the motions, Docs. 13, 17.

It is SO ORDERED.

Dated:   May 9, 2024
         New York, New York

                                                    _____
                                                    EDGARDO RAMOS, U.S.D.J.

15